IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GARY MATTHEW MYSLINSKI,          §
                                 §
      Plaintiff,                 §
                                 §
v.                               §          CIVIL ACTION NO. H-14-2592
                                 §
CAROLYN W. COLVIN,               §
ACTING COMMISSIONER OF           §
THE SOCIAL SECURITY              §
ADMINISTRATION,                  §
                                 §
      Defendant.                 §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Amended Motion for Summary Judgment (Doc. 18).[2]  The court has considered the motions, the responses, the administrative record, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 6.

[2]     Defendant's Amended Motion for Summary Judgment Supplanted its original motion (Doc. 12), which the court will moot administratively.

disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act ("the Act").

## A.  __Medical History__

Plaintiff was born on January 28, 1958, and was fifty-one years old on the date of the alleged onset of disability.[3] Plaintiff attended college for two years.[4]  Prior to his alleged onset of disability, Plaintiff was the owner and manager of a construction company.[5] He also had previous work experience as a stocker and as a warehouse manager.[6]  In early 2012, Plaintiff worked as a retail clerk and stocker at a lawn-care store for up to thirty hours a week.[7] At various times during the relevant period, Plaintiff was diagnosed with diabetes mellitus ("diabetes"), depression, pancreatitis, high blood pressure, high cholesterol, cirrhosis of the liver, encephalopathy, and viral hepatitis.[8]

### 1. Diabetes and Pancreatitis

Plaintiff was admitted to the intensive care unit at St. Luke's Hospital in Bethlehem, Pennsylvania, on January 16, 2010,

---

[3]     See Tr. of the Admin. Proceedings ("Tr.") 19, 225.

[4]     See Tr. 155, 608.

[5]     See Tr. 38, 155.

[6]     See Tr. 40, 155.

[7]     See Tr. 26, 39.

[8]     See, e.g., Tr. 265-66, 1065.

with diagnoses of upper gastrointestinal bleeding, alcohol abuse, anemia, and hepatic encephalopathy ("HE").[9] Plaintiff underwent an esophagogastroduodenoscopy ("EGD"), which revealed esophageal varices, blood in the stomach, an ulcer in the antrum, and a normal duodenum.[10] The EGD was repeated on January 18, 2010, and revealed esophageal varices, a normal stomach without blood, and a normal duodenum.[11] Plaintiff was given benzodiazepines for alcohol withdrawal to prevent delirium tremens.[12] It was noted that Plaintiff "became hemodynamically stable and anemia began to improve."[13] Plaintiff was moved from the intensive care unit on the same day.[14]

On January 19, 2010, an abdominal ultrasound revealed marked dilation of the pancreatic duct.[15] On January 20, 2010, a magnetic resonance cholangiopancreatography revealed the same findings.[16]

---

[9]   See Tr. 833.  "Hepatic encephalopathy is a brain disorder that develops in some individuals with liver disease. . . . [It] encompasses a spectrum or continuum of disease that ranges from a subtle condition with no outward signs or symptoms to a severe form that can cause serious, life-threatening complications."  WebMD, http://www.webmd.com/digestive-disorders/hepatic-encephalopathy (last visited July 20, 2015).

[10]   Id.  Esophageal varices are "dilated blood vessels in the esophagus . . . caused by portal hypertension."  WebMD, http://www.webmd.com/digestive-disorders/bleeding-varices (last visited July 20, 2015).

[11]   Id.; see also Tr. 834.

[12]   Tr. 834.

[13]   Id.

[14]   Tr. 834.

[15]   Tr. 833.

[16]   Id.

On January 22, 2010, Plaintiff underwent an upper endoscopic ultrasound ("EUS") that "revealed a dilated pancreatic duct with no masses."[17]   Plaintiff continued to improve and agreed to re-enter alcohol treatment upon discharge.[18]   When stable, Plaintiff was discharged with Ativan for alcohol withdrawal and lactulose for HE.[19]   At discharge, his diagnoses were pancreatic duct changes consistent with either intraductal papillary mucinous neoplasm or chronic pancreatitis, upper gastrointestinal bleed, alcohol abuse, anemia, and HE.[20]

On May 12, 2010, Plaintiff visited the Peoples Community Health Center for his first appointment with Diana T. Atwal, M.D., ("Dr. Atwal").[21]   Plaintiff appeared alert in no apparent distress. Dr. Atwal reviewed Plaintiff's major systems and found no abnormalities.[22]   Dr. Atwal noted that Plaintiff's blood sugar was low when taking his diabetes medication twice daily and adjusted the dosage.[23]   She also screened and counseled him on depression, tobacco use, and alcoholic liver disease ("cirrhosis").[24]   She added

---

[17]   See Tr. 833-34.

[18]   Tr. 834.

[19]   Id.

[20]   See Tr. 833.

[21]   See Tr. 436-40.

[22]   See Tr. 438.

[23]   See Tr. 439.

[24]   See Tr. 439.

a diagnosis of gastroesophageal reflux disease ("GERD") to Plaintiff's pre-existing conditions and prescribed corresponding medication.[25] Dr. Atwal ordered a series of laboratory tests, and specimens were collected that day.[26]

Dr. Atwal also encouraged Plaintiff to be more actively involved in taking care of his health and counseled Plaintiff on lifestyle modifications, including maintaining his body mass index between 18.5 and 24.9, eating a healthy diet, increasing physical activity, ceasing smoking, and limiting alcohol intake.[27] The doctor instructed Plaintiff to return if his symptoms "worsen[ed] or fail[ed] to improve."[28]

On June 8, 2010, Dr. Atwal reviewed the results of the May laboratory tests with Plaintiff.[29] The tests reflected high cholesterol, a high level of urine microalbumin,[30] and a high average concentration of hemoglobin in the red blood cells ("HbA1c").[31] Dr. Atwal doubled Plaintiff's daily diabetes

---

[25]   See id.

[26]   See Tr. 440-41.

[27]   See Tr. 437, 443-44.

[28]   See Tr. 437, 443.

[29]   See Tr. 428-29.

[30]   The level of urine microalbumin indicates how well the kidneys are functioning.  See WebMD, http://www.webmd.com/diabetes/microalbumin-urine-test (last visited July 16, 2015).

[31]   See 428-29, 441-44.

medication.[32]   On July 2, 2010, Rekha Afzalpurkar, M.D., ("Dr. Afzalpurkar"), saw Plaintiff, who presented with high blood pressure and fatigue.[33]   Dr. Afzalpurkar refilled Plaintiff's medication for cirrhosis and prescribed a different medication for hypertension.[34]

Plaintiff met with Dr. Atwal on July 21, 2010, for a diabetes followup.[35]   Dr. Atwal noted that Plaintiff was keeping a blood-sugar log but made no changes to the treatment plan.[36]   Plaintiff's next follow-up appointment with Dr. Atwal was on August 4, 2010, and the doctor reviewed laboratory results from July 22, 2010.[37] The laboratory tests revealed the following abnormal results: a high white blood count ("WBC"); a high HbA1c; a high red cell distribution width ("RDW"); low basophils; high glucose; and high levels of the liver enzymes alkaline phosphatase ("ALP") and alanine aminotransferase ("ALT").[38]

At the August appointment, Dr. Atwal ordered a complete blood count test and an ALT and aspartate aminotransferase ("AST") test,

---

[32]   See Tr. 429.

[33]   See Tr. 418.

[34]   See Tr. 417.

[35]   See Tr. 407-10.

[36]   See Tr. 408-09.

[37]   See Tr. 398-402.

[38]   See Tr. 399-401.

6

which were collected on the day of his appointment.[39]  Those tests indicated high white blood count, high mean corpuscular hemoglobin ("MCH") and mean corpuscular volume ("MCV") levels, and low eosinophil and basophil levels.[40]  Plaintiff's liver enzymes were within normal ranges.[41]

Laboratory tests performed later in August revealed a high average of blood-sugar levels and high levels of the liver enzymes ALP and ALT.[42]  The remainder of the liver panel, as well as other blood tests, were within normal ranges.[43]

An abdominal ultrasound was completed on August 31, 2010.[44] The radiologist concluded "[d]ilated gallbladder with sludge," "[d]ilated common bile duct and pancreatic ducts with stones," and "[c]holecystitis[45] by sonography" and recommended a follow-up computed tomography scan ("CT").[46]

---

[39]    See Tr. 402-03.

[40]    See Tr. 403.

[41]    See id.

[42]    See Tr. 392, 394.

[43]    See Tr. 392-94.

[44]    See Tr. 352-53.

[45]    "Cholecystitis is inflammation of the gallbladder" most often caused by a gallstone stuck in the cystic duct.  WebMD, http://www.webmd.com/ digestive-disorders/tc/cholecystitis-overview (last visited July 21, 2015).

[46]    Tr. 953.

The CT of the pelvis was completed on September 29, 2010, and was compared to the recent abdominal ultrasound.[47]  The CT revealed a distended gallbladder with moderate extrahepatic biliary duct dilation, a liver with a mildly nodular contour, and a pancreas with calcifications throughout the body and head.[48]  The reviewing physician could not rule out focal mass in the pancreas or focal lesion in the liver and recommended follow-up magnetic resonance imaging ("MRI") and examination.

A liver profile in October 2010 revealed high levels of protein and ALP.[49]  Plaintiff's kidney functions were within normal ranges in November 2010, as they had been in August.[50]

An abdominal MRI performed on November 15, 2010, was compared to the September CT and the August abdominal ultrasound.[51]  The MRI showed a mildly nodular contour to the liver with relative enlargement of the caudate lobe, mildly prominent short gastric vessels, and a peripheral wedge-shaped area near the hepatic dome that "likely represent[ed] focal fibrosis."[52]  No other hepatic mass lesions were noted.[53]  The MRI also "revealed diffuse pancreatic

---

[47]  See Tr. 944-46.

[48]  See Tr. 945.

[49]  See Tr. 382.

[50]  See Tr. 366, 392.

[51]  See Tr. 942-43.

[52]  See Tr. 942.

[53]  See id.

duct dilation with atrophy" of its functional elements, but no evidence of obstructing mass lesions.[54] Plaintiff's gallbladder was shown to be mildly distended with sludge but no gallstones; and the bile ducts were dilated.[55]

These results suggested chronic pancreatitis, focal fibrosis in the hepatic dome, possibly a postinflammatory stricture near the ampulla, and possibly changes of early cirrhosis.[56] The reviewing professional suggested that a follow-up MRI be considered in nine to twelve months.[57]

Plaintiff did not meet with Dr. Atwal again until November 24, 2010, for a followup.[58] At that time, the doctor split the daily dosage of diabetes medication into two doses to relieve gastrointestinal side effects.[59] Blood collected on the day of the appointment returned normal results except for low sodium and high HbA1c.[60] Plaintiff met with Dr. Atwal on January 13, 2011, for follow up.[61] Although Plaintiff's blood-sugar average was high in December, Dr. Atwal made no changes to Plaintiff's diabetes

---

[54]   Tr. 943.

[55]   Id.

[56]   See Tr. 943.

[57]   See id.

[58]   See Tr. 355-58.

[59]   See Tr. 357.

[60]   See Tr. 342, 359-61.

[61]   See Tr. 340-45.

medication or to his treatment plan.[62]  At the next appointment on March 9, 2011, Dr. Atwal made no changes to the treatment plan.[63]

In late April 2011, Plaintiff had trouble managing his blood-sugar level and visited the clinic's triage station.[64]   Dr. Afzalpurkar saw Plaintiff, ordered a refill of his diabetes medication, and referred him to Dr. Atwal for a follow-up appointment.[65]  Plaintiff visited Dr. Atwal on May 26, 2011, and the doctor reviewed the results of tests on blood collected on May 5, 2011.[66]  At that time, Plaintiff's MCV, ALP, ALT, HbA1c, and glucose levels were high and his eosinophil and basophil levels were low.[67]  According to Plaintiff's blood-sugar log, he was experiencing elevated levels at home.[68]  Dr. Atwal again doubled Plaintiff's diabetes medication.[69]

Plaintiff saw Dr. Atwal in July 7, 2011, for a rash, had blood drawn on July 19, 2011, and saw Dr. Atwal for diabetes follow up on

---

[62]   See Tr. 340-44.

[63]   See Tr. 318-21.  A note of the same date by a licensed vocational nurse stated (exactly as reprinted here): "Pt. Came in for high b/p this morning let pt. rest and recheck after 15 min. Still the same 155/105 . . . . Denies any discomfort or chest pain at this time . . . . Pt. Left with out being discharge." Tr. 322.  The time of that note is twenty-four minutes after the note was entered by Dr. Atwal about the follow-up appointment.  Compare Tr. 318 with Tr. 322.

[64]   See Tr. 302-06.

[65]   See Tr. 303-05.

[66]   See Tr. 292-96.

[67]   See Tr. 293-94.

[68]   See Tr. 292.

[69]   See Tr. 295.

10

July 21, 2011.[70]  The blood tests revealed high levels of glucose, ALP, MCV, RDW, Hb1Ac, lymphocyte, monocyte, microalbumin, and enzyme gamma-glutamyl transpeptidase and low levels of neutrophil and basophil.[71]  Plaintiff's blood-sugar log indicated that his levels were in fair control at home.[72]

On August 8, 2011, Plaintiff underwent an upper EUS that reaffirmed the diagnosis of chronic pancreatitis.[73]  Study of a pancreatic biopsy collected at the time led to a finding of benign cells and blood.[74]  A contemporaneous EGD was normal except for a few columns of dilated veins.[75]

On September 13, 2011, Plaintiff had an appointment at the Ben Taub Gastroenterology Clinic.[76]  Robert J. Sealock, M.D., noted that Plaintiff's main complaint was abdominal bloating especially after eating and that the bloating was relieved by medication.[77]  Upon examination, the doctor found no abdominal swelling, peripheral edema, or confusion.[78]  Plaintiff reported that he had not vomited

---

[70]    See Tr. 267-283.

[71]    See Tr. 274-77.

[72]    See Tr. 267.

[73]    See Tr. 1059.

[74]    See Tr. 1060.

[75]    See id.

[76]    See Tr. 1057

[77]    See id.

[78]    See id.

blood or suffered from confusion but was experiencing insomnia at night with daytime naps and was having difficulty controlling his blood sugar levels.[79]  Included in the medical record for that appointment were reports from the abdominal MRI performed in November 2010, the laboratory tests run in July 2011, the upper EUS, biopsy, and EGD performed in August 2011.[80] Selvi Thirumurthi, M.D., ("Dr. Thirumurthi") confirmed the diagnoses of cirrhosis and chronic pancreatitis.[81]  He wrote, "PSE [portosystemic encephalopathy][82] = insomnia likely 2/2 to nocturia."[83]  He did not observe asterixis (jerking movements of the hands associated with various encephalopathies[84]) or accumulation of abdominal fluid.[85]

The doctor's notes from Plaintiff's follow-up appointments with Dr. Atwal in August and October 2011 reflected no changes to

---

[79]    See id.

[80]    See Tr. 1058-65.

[81]    See Tr. 1065.

[82]    Portosystemic encephalopathy is also known as portal-systemic or hepatic encephalopathy.  See WebMD, http://www.webmd.com/digestive-disorders/hepatic-encephalopathy (last visited July 22, 2015); Wikipedia, https://en.wikipedia.org/wiki/Hepatic_encephalopathy (last visited July 22, 2015).

[83]    Tr. 1065.

[84]    Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/asterixis (last visited July 22, 2015).

[85]    See Tr. 1065

his condition or his treatment plan.[86]  Plaintiff's blood-sugar log indicated that his levels were under control at home.[87]

An MRI completed in October 2011 showed a normal-size liver with fatty infiltration but no focal mass, a normal-size right kidney, a normal aorta, a gallbladder containing sludge but no shadowing stone, and an unremarkable pancreas.[88]

At the January 2012 appointment, Dr. Atwal reviewed Plaintiff's laboratory results from October.[89]  The results showed high levels of glucose, MCH, RDW, monocytes, ALP, direct bilirubin, and HbA1c and low levels of red blood cells, neutrophils, eosinophils, and basophils.[90]  Dr. Atwal noted that Plaintiff was slightly more than seventy-five percent medication compliant and was not experiencing any side effects.[91]  Plaintiff's blood pressure met the doctor's goal for diabetic patients.[92]  She noted that the treatment plans for the blood pressure was lifestyle modification and medication.[93]  Plaintiff's blood-sugar log again indicated that

---

[86]     See Tr. 263-66, 241-46.

[87]     See Tr. 243, 263.

[88]     See Tr. 249-50.

[89]     See Tr. 226-31.

[90]     See Tr. 247-48.

[91]     See Tr. 227.

[92]     See id.

[93]     Id.

it was under fair control at home.[94]  The doctor did not address the results of the October abdominal MRI but noted that Plaintiff was being followed by a gastrointestinal specialist.[95]

On February 18, 2012, Plaintiff was seen by Dr. Atwal for follow up on elevated liver function tests.[96]  She reviewed the laboratory tests performed a few days earlier, which showed high levels of glucose, MCV, MCH, RDW, total and direct bilirubin, ALP, AST, ALT, and HbA1c and low levels of sodium, RBC, eosinophils, and basophils.[97]  The doctor noted that Plaintiff was experiencing no symptoms of high blood pressure.[98]  As far as changes in Plaintiff's treatment plan, Dr. Atwal changed Plaintiff's diabetes medicine, started a daily aspirin regimen, and discontinued Tylenol.[99]  Dr. Atwal also ordered a repeat liver profile to be performed that day.[100]

Dr. Atwal saw Plaintiff again a week later.[101]  The repeat liver profile indicated high levels of ALP, ALT, and direct billirubin, but total bilirubin and AST were back within normal

---

[94]     Id.

[95]     See Tr. 230.

[96]     See Tr. 573-77.

[97]     See Tr. 588-90.

[98]     See Tr. 577.

[99]     See Tr. 576.

[100]    See id.

[101]    See Tr. 565-70.

ranges.[102]   The doctor made no changes to the treatment plan but ordered another liver panel.[103]

On March 14, 2012, Plaintiff had a follow-up appointment with Nisreen S. Husain, M.D., ("Dr. Husain") of the Ben Taub Gastroenterology Clinic concerning Plaintiff's chronic pancreatitis and cirrhosis in light of the recent elevated liver function tests.[104]   Dr. Husain compared the liver functions tests of October 2011, February 14, 2012, February 18, 2012, and February 25, 2012, and reviewed imaging results from August and October 2011.[105]   Dr. Husain opined that the higher liver function tests could be secondary to Plaintiff's Tylenol usages rather than the result of his gastrointestinal diagnoses and ordered a complete work up for chronic liver disease and repeat abdominal imaging.[106]   He advised Plaintiff to avoid fatty foods.[107]   Stephan C. Pappas, M.D. ("Dr. Pappas"), reviewed Dr. Husain's treatment notes, examined Plaintiff, and agreed with Dr. Husain's plan.[108]   Dr. Pappas stated

---

[102]   See Tr. 578.

[103]   See Tr. 569.

[104]   See Tr. 540-44.

[105]   See Tr. 542.

[106]   See Tr. 543.

[107]   See id.

[108]   See Tr. 544.

that Plaintiff was "doing quite well currently as noted by Dr. Husain."[109]

Plaintiff next saw Dr. Atwal on March 17, 2012, when he appeared at the triage station complaining of lower back pain for the preceding three days most likely an injury suffered at his work at the lawn-care store.[110]   Dr. Atwal prescribed pain-relief medication and referred Plaintiff to physical therapy.[111]  Plaintiff was given a back-to-work note.[112]

Plaintiff met with Dr. Atwal on May 9, 2012, for to follow up on diabetes and hypertension.[113]  She noted that his blood sugar was under fair control at home and that he had no symptoms of hypertension.[114]

On May 18, 2012, Plaintiff underwent an endoscopic procedure that revealed a "[s]ignificant [amount of] retained [solid] food in gastric body" and "apparent extrinsic compression of the antrum/duodenum."[115]   Although there were no complications, the medical provider was unable to perform an endoscopic retrograde cholangiopancreatogram ("ERCP"), a test that "checks the tubes

---

[109]   Id.

[110]   See Tr. 561-65.

[111]   See Tr. 564.

[112]   See Tr. 563.

[113]   See Tr. 1384-87.

[114]   See Tr. 1385, 1387.

[115]   Tr. 1377.

(ducts) that drain the liver, gallbladder, and pancreas" or an EUS[116] due to the finding of bowel compression.[117] The attending physician recommended an abdominal/pelvic CT and a follow up with the gastroenterologist.[118]

Plaintiff visited Dr. Atwal on August 2, 2012.[119] Dr. Atwal stated, regarding the history of Plaintiff's present illness:

> Patient has type II diabetes. The patient is >75% adherent with their use of medication[.] He is >75% adherent with his diet. He sporadically monitors his home glucose levels. The results of the home monitoring are generally above range[.]
>
> The patient does not meet goal for their diabetes care for this visit[.] The goal is for the A1C [HbA1c] to < 7 and the result does not meet goal[.]
>
> The patient falls in a hypertensive category similar with other patients of hypertension, stage 1. The treatment is intended to bring BP [blood pressure] < 140/90 or < 130/80 with diabetes or kidney disease. The patient['s] blood pressure meets goal for the current visit[.][120]

Dr. Atwal made no changes to Plaintiff's treatment plan.[121]

In her notes for an appointment in late September, Dr. Atwal repeated the above history of Plaintiff's present illness.[122] Dr.

---

[116]   WebMD, http://www.webmd.com/digestive-disorders/endoscopic-retrograde-cholangiopancreatogram-ercp (last visited July 20, 2015).

[117]   Tr. 1377.

[118]   See Tr. 1379.

[119]   See Tr. 1360-65.

[120]   Tr. 1361-62.

[121]   See Tr. 1362-63.

[122]   See Tr. 1340.

Atwal started Plaintiff on insulin but made no other changes to Plaintiff's treatment.[123]

Upon Dr. Atwal's referral for management of diabetes, Plaintiff was seen by Yvonne Mendoza-Becerra, Pharm.D., ("Dr. Mendoza") on October 18, 2012.[124]  Dr. Mendoza, who was a clinical pharmacist specialist, noted that Plaintiff was fifty percent adherent with medication usage and fifty percent adherent to his diet and that he did not monitor his home glucose levels.[125]  She listed his medical diagnoses as diabetes, depression, alcohol dependence in remission, blood transfusion, tobacco use disorder, prostate enlargement, and hypertension.[126]  Dr. Mendoza reviewed Plaintiff's medical history and lab work.  She advised Plaintiff to quit smoking and explained the risks of not complying with medication treatment, not keeping scheduled appointments, and not following through with lab work when ordered.[127]

On October 25, 2012, Plaintiff saw Dr. Atwal for shoulder pain, abdominal pain, and jaundice.[128]  Plaintiff exhibited mild abdominal pain to palpation.[129]  Dr. Atwal ordered stat laboratory

[123]   See Tr. 1341-42.

[124]   See Tr. 1319-28.

[125]   See Tr. 1321.

[126]   See Tr. 1323.

[127]   See Tr. 1324, 1327.

[128]   See Tr. 1310-19.

[129]   See Tr. 1313.

tests, which revealed high levels of MCH, RDW, urobilinogen, and glucose and low levels of RBC, hemoglobin, eosinophils, basophils, and sodium.[130]  At Dr. Atwal's direction, Plaintiff drove himself to the emergency room at Ben Taub Hospital.[131]

Plaintiff was admitted to the hospital with diagnoses of abnormal laboratory results and jaundice.[132]  Plaintiff was experiencing recurrent biliary obstruction and "underwent an exchange of biliary stents and extraction of biliary stones successfully with good tolerance."[133]  The medical providers anticipated a trend toward normalization of liver functions.[134]

Plaintiff saw Dr. Mendoza on November 14, 2012, and December 6, 2012, for medication management.[135]  In November 2012, Dr. Mendoza noted that Plaintiff was seventy-percent adherent to medication prescriptions and to a diabetic diet.[136]  Plaintiff reported that he sporadically monitored his glucose levels at home and that the results were generally above the desired range.[137]  The clinical pharmacist recommended aggressive drug management and

---

[130]    See Tr. 1314-16.

[131]    See Tr. 1318.

[132]    See Tr. 617.

[133]    Tr. 618, 621.

[134]    See Tr. 622.

[135]    See Tr. 1282-87.

[136]    See Tr. 1297.

[137]    See id.

increased Plaintiff's insulin dosage.[138]  Notes from the December 2012 appointment were essentially the same, including an additional increase in insulin dosage, except that Dr. Mendoza assessed Plaintiff as only fifty percent adherent to a diabetic diet.[139]

Plaintiff also met with Dr. Atwal on December 6, 2012.[140] Plaintiff reported no issues with jaundice since his biliary stent replacement in January 2010.[141]  Dr. Atwal made no changes to Plaintiff's treatment plan.[142]

On January 31, 2013, Plaintiff saw Dr. Mendoza, who noted that Plaintiff was only fifty percent adherent to his medication prescriptions and a diabetic diet.[143]

## 2. Depression

On May 12, 2010, Dr. Atwal referred Plaintiff for a psychiatric consult for depression, insomnia, and history of alcoholism.[144]  On May 21, 2010, Asim A. Shah, M.D., ("Dr. Shah"), a psychiatrist, saw Plaintiff for the first time.[145]  According to

---

[138]    See Tr. 1299.

[139]    See Tr. 1282-87.

[140]    See Tr. 1275-79.

[141]    See Tr. 1277.

[142]    See Tr. 1278-79.

[143]    See Tr. 1257, 1261.

[144]    See Tr. 433, 439.

[145]    See Tr. 433.

Dr. Shah's notes, Plaintiff's chief complaint was "I need help."[146]
Plaintiff reported having been depressed for a year, since he lost
his business and began struggling financially.[147]  He also stated
that, during that same time period, he had experienced several new
medical issues.[148]  Plaintiff described feeling frustrated "a lot"
and lacking interest or motivation, and experiencing helplessness
and hopelessness.[149]

Dr. Shah saw no evidence of suicidal or homicidal ideation or
any symptoms of psychosis.[150]  He diagnosed Plaintiff with major
depressive disorder and alcohol dependence in remission and scored
his Global Assessment of Functioning ("GAF") at fifty-eight out of
one hundred, a score at the high end of the category for moderate
symptoms or moderate difficulty in social, occupational, or school
functioning.[151]  Dr. Shah increased the dosage of Plaintiff's
depression medication.[152]

---

[146]   Id.

[147]   See id.

[148]   See id.

[149]   See id.

[150]   See id.

[151]   See Tr. 434; Diagnostic & Statistical Manual of Mental Disorders 32
(Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which
dropped GAF in favor of the World Health Organization Disability Assessment
Schedule 2.0).

[152]   See Tr. 434.

Dr. Shah saw Plaintiff a month later for medication management.[153] Plaintiff reported that the medications were working well and that he felt more joyful and relaxed, denying any symptoms of depression or anxiety or side effects of the medication.[154] He told the doctor that he still experienced "occasional attacks, but they [were] less and tolerable now."[155]

Dr. Shah continued to follow Plaintiff for medication management, adjusting Plaintiff's medication as necessary.[156] At some appointments, Plaintiff reported no significant changes or good results with the medication.[157] At others, Plaintiff reported that he did not think the medication was working and sought a change.[158] At his February 15, 2013 appointment, Plaintiff reported that he was feeling better and that the medication was helping.[159]

During this time, Plaintiff also received individual psychotherapy.[160] Plaintiff first met Patricia W. Greer, ("Ms.

---

[153]    See Tr. 423-24.

[154]    See Tr. 423.

[155]    Id.

[156]    See Tr. 234, 252, 300, 313, 328, 334, 346, 368, 371, 380, 387, 396, 556, 581, 1242, 1289, 1350, 1373.

[157]    See, e.g., Tr. 234, 368, 387, 581, 1242, 1350.

[158]    See, e.g., Tr. 252, 300, 313, 328, 334, 346, 371, 380, 396, 556, 1289, 1373.

[159]    See Tr. 1242.

[160]    See Tr. 236, 254, 286, 307, 310, 315, 325, 331, 337, 349, 353, 364, 377, 384, 389, 552, 559, 584, 593, 1247, 1263, 1268, 1272, 1293, 1303, 1307, 1330, 1335, 1346, 1353, 1357, 1369, 1381, 1391, 1395, 1398, 1417-18, 1447-48.

Greer") on July 29, 2010.[161]  In her notes on the intake interview, Ms. Greer stated that Plaintiff's "number one goal [was] to get his health straightened out" and his next goal was to focus on a career.[162]  Ms. Greer repeated the diagnosis of Dr. Shah's initial appointment.[163]  The treatment plan was to assist Plaintiff in processing the disappointment of suffering from so many health issues, in exploring family dynamics, and in formulating a goal for future employment.[164]

After the initial evaluation, Plaintiff attended weekly individual therapy sessions with Ms. Greer.[165]  Over the years of therapy, Plaintiff's mood and coping skills generally improved, although at times he expressed that he was struggling with his finances, his health, his sleeping habits, or his familial and other interpersonal relationships.[166]  On February 13, 2013, Plaintiff spoke about having a busy month and maintaining a "pretty good" mood, although too much free time made him anxious.[167]

---

[161]   See Tr. 405-06.

[162]   Tr. 405.

[163]   See Tr. 406.

[164]   See id.

[165]   See Tr. 236, 254, 286, 307, 310, 315, 325, 331, 337, 349, 353, 364, 377, 384, 389, 552, 559, 584, 593, 1247, 1263, 1268, 1272, 1293, 1303, 1307, 1330, 1335, 1346, 1353, 1357, 1369, 1381, 1391, 1395, 1398, 1417-18, 1447-48.

[166]   See id.

[167]   See Tr. 1247.

In April 2011, Plaintiff was a participant in a study entitled "Optimization of Intravenous Ketamine for Treatment-Resistant Depression: A Randomized, Placebo-Controlled, Triple-Masked, Clinical Trial."[168]  Plaintiff was exited from the trial as a non-responder after two weeks.[169]

From November 2011 through December 2012, Plaintiff attended group therapy sessions, including a men's therapy group and an interpersonal skills therapy group.[170]  According to the notes, Plaintiff participated and never demonstrated despondency or suicidal/homicidal ideation.[171]  Over the course of time, Plaintiff became more engaged and interactive in the groups and demonstrated improved self-insight.[172]

Daniel K. Sanders, Psy.D., ("Dr. Sanders"), a neuropsychologist, evaluated Plaintiff on October 12, 2012.[173]  Plaintiff told Dr. Sanders that, within the previous thirty days, Plaintiff had been experiencing a decrease in energy level and

---

[168]   See Tr. 1450-83.

[169]   See Tr. 1481.

[170]   See Tr. 447-66, 519-23, 664, 667-68, 671-72, 675-76, 679-80, 694, 698, 702, 705-06, 709-10, 713, 717, 721, 724-25, 729, 732-33, 740, 743-44, 753, 756, 759-60, 763, 766-67, 770, 774, 778, 781-82, 794, 797-98, 801, 810, 813-14, 817, 821, 958, 967, 971, 974-75, 978, 982, 985-86, 989-90, 993-94, 997-1005, 1012-13, 1016-17, 1023-24, 1027-28, 1031-32, 1035, 1039, 1042-43, 1046, 1053.

[171]   See id.

[172]   See id.

[173]   See Tr. 608-15.

24

motivation and an increase in sleep, boredom, and indecisiveness.[174]
He also reported decreased abilities to remember, to concentrate,
and to perform chores or jobs.[175]   Describing his depression,
Plaintiff said that it "comes and goes."[176]

Dr. Sanders recorded the following about Plaintiff's behavior
and mental status:

> Expressive language was intact[;] receptive language was
> intact[,] and articulation was normal.  His expressive
> vocabulary was low average[,] and his gramm[a]r was
> normal. [Plaintiff's] thought processes were normal.
> There were no apparent defects in the form or content of
> his thoughts.  His ability to use good judgment when
> confronting practical situations was good.
>
> [Plaintiff's] affect was broad[,] and his mood was
> normal.  [Plaintiff] was cooperative and friendly.
> Rapport with the examiner was easy to establish.
> [Plaintiff's] comprehension of test instructions was
> good.  His responses to many tests were careful and
> thoughtful.  He put forth good effort. [Plaintiff] was
> not very distractible.[177]

In addition to the clinical interview, Dr. Sanders administered the
Wechsler Adult Intelligence Scale, the Wide Range Achievement Test,
and the Personality Assessment Inventory.[178]

Test scores indicated that Plaintiff's academic functioning
ranged from low average to average, his intellectual functioning

---

[174]   See Tr. 609.

[175]   See id.

[176]   Id.

[177]   Tr. 609-10.

[178]   See Tr. 608, 610-13.

was low average, and his reading comprehension, reading recognition, spelling, and arithmetic were all average for his age.[179]   The tests further indicated that Plaintiff's verbal intellectual functioning, retention of general information, nonverbal intellectual functioning, and working memory were average, while his vocabulary skills, abstract thinking, logic skills, use of spatial reasoning and problem-solving skills, and short-term memory and attention skills were all low average.[180]

Dr. Sanders described Plaintiff's visual spatial reasoning as a "relative strength when compared to his other abilities."[181]  With regard to processing speed, Dr. Sanders opined that it was in the severely deficient range and that Plaintiff's concentration and learning skills and persistence and speed were moderately deficient.[182]   Plaintiff's "visual-motor speed was a relative weakness when compared to his other abilities," according to Dr. Sanders.[183]

The results regarding Plaintiff's personality suggested that Plaintiff tended "to avoid negative or unpleasant aspects of

---

[179]    Tr. 610.

[180]    Id.

[181]    Tr. 611.

[182]    See id.

[183]    Id.

himself."[184]   Dr. Sanders gleaned those opinions from Plaintiff's response style, which appeared not to be completely forthright.[185] On the other hand, Plaintiff described the intensity of problems in the following areas as greater than would be expected of a defensive respondent:

> preoccupation with physical functioning; physical signs of depression; history of antisocial behavior; frequent routine physical complaints; disruptions in thought process; alcohol abuse or dependence; stress in the environment; compulsiveness or rigidity; sensation-seeking behavior; unhappiness; unusual sensory-motor problems; low frustration tolerance; poor sense of identity; and poor control over anger.[186]

Dr. Sanders deduced that Plaintiff viewed himself positively and was confident, resilient, and optimistic, although changes in his self-esteem could occur in response to changes in his circumstances and be accompanied by uncertainty about goals, values, and important life decisions.[187]   Plaintiff appeared to Dr. Sanders to be friendly, extroverted, open and straightforward, social, and comfortable in most social situations.[188]   Plaintiff's results indicated that he had a highly developed system of support with reasonably low stress, which Dr. Sanders noted as "a favorable

---

[184]   Id.

[185]   See id.

[186]   Tr. 611-12.

[187]   See Tr. 612.

[188]   See id.

prognostic sign for future adjustment."[189]   Plaintiff was not experiencing suicidal ideation, according to Dr. Sanders.[190]

Dr. Sanders concluded that Plaintiff was suffering from major depressive disorder and alcohol abuse in remission.[191]   As functional limitations, Dr. Sanders identified mildly deficient visual abstract reasoning, severely deficient processing speed, low energy, sleep disturbance, and indecisiveness.[192]  Dr. Sanders also identified eleven personal assets, including high average mental transposition and manipulation, average retention of general information, average skills in other academic/intellectual areas, good personal appearance and grooming, ability to follow direction, and cooperation and friendliness.[193]   Dr. Sanders assessed Plaintiff's GAF at sixty-five out of one hundred, a score in the middle of the category for mild symptoms or some difficulty in social, occupational, or school functioning.

Dr. Sanders addressed Plaintiff's work-related deficiencies and strengths:

> From a vocational perspective, [Plaintiff's] performance indicated the following deficiencies.  He may not perform well on tasks that require the ability to extrapolate or draw comparisons from visually presented

---

189   Tr. 613.

190   See id.

191   See id.

192   See Tr. 613.

193   See Tr. 613-14.

material.    His   severely   deficient   processing   speed
indicated  that  he  may  require  extra  time  to  complete
tasks  or  assignments.   His  depression  may  result  in  times
of  low  motivation  which  may  lead  to  poor  job  performance,
absenteeism  or  unreliability.

     [Plaintiff]    demonstrated    several    strengths.
[Plaintiff]  may  perform  better  on  tasks  that  require  the
ability  to  recall  previously  learned  information.   He  may
perform  better  on  tasks  that  require  the  ability  to  see
relationships  along  a  time  line.    He  may  perform  better
on  tasks  that  require  the  ability  to  work  with  numbers
and  use  numerical  reasoning.    He  may  perform  better  on
tasks   that   require   the   ability   to   perform   mental
calculations.   He  may  do  better  on  tasks  that  require  the
ability  to  follow  specific  directions.[194]

Dr.   Sanders   recommended   psychotherapy   for   Plaintiff   and
suggested  that  Plaintiff  possibly  could  "benefit  from  a  complete
neuropsychological   evaluation   to   further   identify   vocational
strengths  and  weaknesses"  related  to  his  cognitive  impairment.[195]

## B.   Application to Social Security Administration

Plaintiff   protectively   applied   for   disability   insurance
benefits  and  supplemental  security  benefits  on  September  8,  2011,
alleging  disability  that  began  on  March  1,  2009.[196]   He  remained
insured   through   December   31,   2010.[197]    Plaintiff   claimed   an

---

[194]    Tr. 614.

[195]    Tr. 615.

[196]    See Tr. 19, 135-42, 151.

[197]    See Tr. 19, 151.

inability to work due to depression, diabetes, pancreatitis, and high blood pressure.[198]

In a Function Report completed on March 28, 2012, Plaintiff stated that he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, completing tasks, following instructions, concentrating, and focusing.[199] He indicated that his abilities to talk, hear, see, remember, understand, use his hands, and get along with others were not affected by his illnesses.[200] Plaintiff reported that he got along well with authority figures but had a hard time with stress and changes in his routine.[201]

Plaintiff described the activities of a usual day as watching television, reading, taking short walks, sleeping, and eating.[202] As far as personal hygiene, Plaintiff reported no problems but stated that he needed reminders and assistance with his medication.[203] Plaintiff said he prepared his own meals, which usually consisted of a sandwich, soup, cereal, or a frozen

---

[198]   See Tr. 154.  At the administrative hearing, Plaintiff's counsel conceded that two other conditions, high cholesterol and herpes, were nonsevere. Tr. 40.

[199]   See Tr. 203.

[200]   See id.

[201]   See Tr. 204.

[202]   See Tr. 199.

[203]   See Tr. 199-200.

dinner.[204]  Plaintiff said he was able to perform light housework, make his bed, and wash dishes, among other chores.[205]

Plaintiff reported going outside daily and stated that he retained the ability to drive, to travel alone, and to shop for food and clothing as needed.[206]  At least two times a week, Plaintiff attended church, took short walks, and/or went to doctor appointments.[207]  His social activities were limited, he said, but he spent time watching television and eating with others on a weekly basis.[208]

On February 23, 2012, James B. Murphy, Ph.D., ("Dr. Murphy") completed a Psychiatric Review Technique Assessment and a Mental Residual Functional Capacity ("RFC") Assessment, and Kelvin Samaratunga, M.D., ("Dr. Samaratunga") completed a Physical RFC Assessment.[209]

Based on Plaintiff's medical record, Dr. Murphy assessed whether Plaintiff's psychiatric disposition met or equaled any of the disorders described in the listings of the regulations[210] (the

---

[204]   See Tr. 200.

[205]   See id.

[206]   See Tr. 201.

[207]   See Tr. 202.

[208]   See Tr. 202, 203.

[209]   See Tr. 467-92.

[210]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

"Listings").[211]    In  particular,  he  considered  Listing  12.04
(affective  disorders).[212]    Regarding  Plaintiff's  functional
limitations,  Dr.  Murphy  found  that  Plaintiff  experienced  mild
restriction in activities of daily living and moderate difficulties
in maintaining social functioning and in maintaining concentration,
persistence,  or  pace,  with  no  episodes  of  decompensation  of
extended  duration.[213]    Dr.  Murphy  concluded  that  Plaintiff's
limitations were not severe enough to meet any Listing, stating
that he was alert and oriented, appropriately dressed, and calm,
that he displayed normal speech and mood, fair judgment, linear
thought process, intact memory, and no signs of psychosis.[214]

In his Mental RFC Assessment, Dr. Murphy rated Plaintiff as
moderately limited in the following categories: (1) "[t]he ability
to  understand  and  remember  detailed  instructions;"  (2)  "[t]he
ability to carry out detailed instructions;" (3) "[t]he ability to
complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent pace
without  an  unreasonable  number  and  length  of  rest  periods;"  and

---

[211]    See Tr. 467.

[212]    See id.

[213]    See Tr. 477.

[214]    See Tr. 479.

(4)"[t]he ability to accept instructions and respond appropriately to criticism from supervisors."[215]

Regarding all other abilities under the broad categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Murphy rated Plaintiff as not significantly limited.[216]   He concluded that Plaintiff was "maximally able to understand, remember, and carry out only simple instructions, make simple decisions, and attend and concentrate for extended periods [and that he could] interact adequately with coworkers and supervisors and respond appropriately to changes in a routine work setting."[217]   He found Plaintiff's alleged limitations wholly credible.[218]

Dr. Samaratunga addressed Plaintiff's physical abilities, finding that he was capable of occasionally lifting or carrying up to fifty pounds, frequently lifting or carrying twenty five pounds, standing and/or walking for a total of about six hours in an eight-hour workday, sitting for a total of six hours in an eight-hour workday, and unlimited pushing and/or pulling.[219]  According to Dr. Samaratunga, the record did not establish any postural,

---

[215]   See Tr. 481-82.

[216]   See id.

[217]   Tr. 483.

[218]   See id.

[219]   See Tr. 486.

manipulative, visual, communicative, or environmental limitations.[220]   Dr. Samaratunga indicated that the record did not contain any medical source opinion on Plaintiff's physical capacity.[221]

Defendant denied Plaintiff's application at the initial level on February 27, 2012, and at the reconsideration level April 26, 2012.[222]   Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[223]   The ALJ granted Plaintiff's request and conducted a hearing on February 21, 2013.[224]

## C. <u>Hearing</u>

Plaintiff and Karen Nielsen, a vocational expert, ("VE") testified at the hearing.[225]   Plaintiff was represented by an attorney.[226]

Plaintiff testified that he was first diagnosed with diabetes in January 2010.[227]   He recounted that, at that time, he had

---

[220]   <u>See</u> Tr. 489.

[221]   <u>See</u> Tr. 491.

[222]   <u>See</u> Tr. 59-64, 73-76.

[223]   <u>See</u> Tr. 83-84.

[224]   <u>See</u> Tr. 34-58, 91-121, 126-28.

[225]   <u>See</u> Tr. 34-58.

[226]   <u>See</u> Tr. 25.

[227]   <u>See</u> Tr. 43.

traveled to Pennsylvania to care for his mother.[228]   After her death, while he was still in Pennsylvania, Plaintiff said, he was admitted to the hospital with pancreatitis and esophageal problems.[229]  Shortly thereafter, according to Plaintiff, a relative helped Plaintiff recognize symptoms of diabetes.[230]  Plaintiff said that he was hospitalized in February 2010.[231]  Through the use of prescribed medicine, Plaintiff stated, he was able to bring his blood-sugar levels under control but that there was an upward tendency in the readings when he was under stress or was not sleeping well.[232]  Plaintiff testified that he continued to urinate frequently and to experience tingling in his extremities as symptoms of diabetes.[233]

Plaintiff said that he continued to suffer from bimonthly attacks of pancreatitis at which times he experienced a severe stomach ache that made it hard to sit, stand, or walk.[234]  Between attacks, Plaintiff said, he suffered from the constant need to use

---

[228]   See Tr. 44.

[229]   See id.

[230]   See id.

[231]   See id.

[232]   See Tr. 46.

[233]   See Tr. 52-53.

[234]   See Tr. 47.

the bathroom and the inability to keep down food.[235]  A hot bath
helped relieve the pain, Plaintiff said.[236]

Plaintiff explained that he had suffered from depression since
he lost his business in the aftermath of Hurricane Ike.[237]
Plaintiff said that he felt lethargic and uncomfortable and was not
able to focus on any activities.[238]  Plaintiff also experienced an
anxiety attack for two to three minutes about once a week.[239]  He
said depression prevents him from engaging in past hobbies,
including bowling and playing in the pool.[240]  A bad day starts with
getting very little sleep, Plaintiff said in response to a question
from his attorney.[241]  He continued, "Not wanting to get out of bed,
but will get out of bed.  I just kind of roam and stare out to
nowhere.  I'm not getting interested in eating or TV, drinking
coffee, sitting and reading.  I just kind of lay around."[242]

He said that he had been seeing Dr. Shah for about three and
one-half years and, at the time of the hearing was seeing one
therapist once a week and another therapist two to three times a

---

[235]    See Tr. 48.

[236]    See Tr. 48.

[237]    See Tr. 236.

[238]    See Tr. 51.

[239]    See Tr. 54.

[240]    See Tr. 54.

[241]    See id.

[242]    Tr. 54-55.

month.[243]  Plaintiff stated that he was a member of a men's group that met once a week.[244]  In addition to psychiatric care and therapy, church services provided another source of comfort, Plaintiff testified.[245]  He also said that medication was helpful.[246]

Plaintiff reported no medication side effects except lethargy.[247]  Plaintiff said he could sit for about an hour at a time, could lift up to twenty-five pounds, and could lift five to ten pounds frequently.  He stated that he was still capable of washing himself, preparing simple meals, driving a motorized vehicle, cleaning his house, washing the dishes, doing laundry, taking out the trash, walking his dogs, and attending weekly services at his church.[248]  Even so, he reported spending most of his day sleeping, watching television, or playing with his dogs.[249]  He said that he read for an hour or two a day and spent almost no time working on a computer.[250]

Plaintiff opined that he would not be able to work effectively full-time due to limited capacity to lift, difficulty focusing, and

---

[243]   See Tr. 50-51.

[244]   See Tr. 51.

[245]   See Tr. 50.

[246]   See Tr. 51.

[247]   See Tr. 50.

[248]   See Tr. 48-50.

[249]   See Tr. 49.

[250]   See Tr. 49-50.

a lack of motivation or drive.[251]  He also stated that he would not be a good employee because he had so many doctor appointments.[252]

Following Plaintiff's testimony, the VE testified.[253]  The VE categorized Plaintiff's past work as the owner/manager of a construction company as light, skilled, his past work as a stocker as heavy, semiskilled, and his past work as a warehouse manager as light, skilled.[254]  The ALJ posed a hypothetical question to the VE asking whether "an individual of the same age, education and work experience as the claimant limited to unskilled medium work [with] occasional interaction with supervisors, coworkers, [and the] general public and with brief access to the restroom every hour or so during the day.[255]

The VE opined that such an individual would not be capable of performing any of Plaintiff's previous jobs.[256]  However, the VE did state that Plaintiff could perform other jobs in the local or national economy.[257]  The VE provided a list of jobs that the hypothetical individual could perform at a medium exertion, unskilled level (laundry worker, cleaner, and hospital cleaner) and

---

[251]   See Tr. 52.

[252]   See id.

[253]   See Tr. 55.

[254]   See id.

[255]   See Tr. 55-56.

[256]   See Tr. 56.

[257]   See id.

at a light exertion, unskilled level (office cleaner, laundry worker, and office helper).[258]

When asked about transferable skills, the VE identified managerial skills.[259]  The VE stated that more than two absences a month on a consistent basis would cause a problem with maintaining employment, that two fifteen-minute breaks a day and a thirty- to sixty-minute lunch were customary for those positions, and that a person in those positions would need to remain on task eighty to eighty-five percent of the time.[260]  A person who failed to meet those expectations on a regular basis would not be able to maintain employment in the cited positions or any other job.[261]

D. **Commissioner's Decision**

On April 18, 2013, the ALJ issued an unfavorable decision.[262] The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.[263]  The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that he had multiple impairments

---

[258]   See id.

[259]   See id.

[260]   See Tr. 57.

[261]   See id.

[262]   See Tr. 16.

[263]   See Tr. 21.

(diabetes, pancreatitis, and depression) that were severe.[264]   The ALJ also acknowledged the following impairments as nonsevere: hypertension; high cholesterol; and alcohol dependence.[265]   The ALJ stated the following with regard to these nonsevere disabilities:

> The claimant's hypertension and cholesterol have been treated with medication and have not resulted in any form of end organ damage. The claimant has not been consistently compliant with medication for these disorders. His dependence upon alcohol is in full-sustained long-term remission. The remission began after his alleged onset date, indicating that he worked at a substantial gainful activity while having the substance addiction disorder. The herpes impairment is intermittent and controlled with medication.[266]

The ALJ found that Plaintiff's severe impairments, individual or collectively, did not meet or medically equal any Listing.[267]   In particular, the ALJ considered Listings 9.08 (diabetes), 12.04 (affective disorders).[268]   The ALJ found neither condition severe enough to meet the Listings.[269]

The ALJ discussed Dr. Sanders' evaluation, identifying many of the strengths and deficiencies noted in Dr. Sanders' report.[270]   For example, the ALJ recited Plaintiff's self-reported personal

---

[264]   See Tr. 21.

[265]   See Tr. 22.

[266]   See id.

[267]   See id.

[268]   See id.

[269]   See id.

[270]   See id.

history, the results of the testing, and Dr. Sanders' conclusions.[271]  The ALJ relied on Dr. Sanders' GAF assessment, which put Plaintiff in the category of mild symptoms.  The ALJ did not specifically mention the finding that Plaintiff's processing speed was severely deficient.[272]

The ALJ also discussed Dr. Murphy's psychological review, noting that Dr. Murphy found that Plaintiff was "maximally able to understand, remember and carry out simple instructions and make simple decisions" and that he was "able to attend and concentrate for extended periods," to "interact adequately with coworkers and supervisors," and "respond appropriately to changes in routine work settings."[273]  The ALJ pointed to other aspects of Dr. Murphy's assessment, which indicated that, despite Plaintiff's major depressive disorder, he had only mild restrictions on activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation.[274]  The ALJ noted that Dr. Murphy found that "[o]verall, the claimant was not compromised in his ability to

---

[271]    See id.

[272]    See id.

[273]    Tr. 23.

[274]    See id.

work."[275]   The ALJ gave great weight to Dr. Murphy's opinion.[276]

The ALJ cited to numerous treatment notes that indicated Plaintiff was actively participating in group therapy and his mood and outlook were improving.[277]   Additionally, the ALJ found that Plaintiff responded and interacted well at the hearing, stating that Plaintiff's testimony was "responsive, coherent and without lapses of concentration."[278]   The ALJ recounted a large portion of Plaintiff's hearing testimony, including Plaintiff's own account of daily activities.[279]   Based on that testimony and the record as a whole, the ALJ found that Plaintiff drove, shopped, completed housework, walked his dogs, used a computer, traveled out of state, and attended meetings and church.[280]   The ALJ also noted that Plaintiff had recently attempted to find a job and had engaged in job activities.[281]

With regard to Plaintiff's physical impairments, the ALJ discussed Dr. Atwal's treatment comments, as well as Plaintiff's desire to return to work, temporary employment, and his less-than-

---

[275]   Id.

[276]   See Tr. 27.

[277]   See Tr. 23.

[278]   Tr. 23, 26.

[279]   See Tr. 26.

[280]   See Tr. 24, 26.

[281]   See id.

complete compliance with medications.[282]   The ALJ relied on the medical review of Dr. Samaratunga, reciting the findings that Plaintiff could "occasionally lift 50 pounds and frequently lift 25 pounds, while standing and walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday."[283]   The ALJ gave Dr. Samaratunga's opinion great weight.[284]

In determining Plaintiff's RFC to perform work-related activities, the ALJ considered the entire record.[285]   The ALJ found that, while the medically determinable impairments would likely cause the alleged symptoms, Plaintiff's statements with regard to intensity, persistence, and limiting effects were not credible to the extent that they were inconsistent with the RFC assessment.[286] The ALJ determined that Plaintiff had the residual functional capacity to perform medium, unskilled work that allowed brief restroom breaks every hour or one and one-half hours and required only occasional interaction with supervisors, coworkers, and the public.[287]

The ALJ found that Plaintiff, given his disabilities, was not

---

[282]    See Tr. 23, 26.

[283]    Tr. 24.

[284]    See Tr. 27.

[285]    See Tr. 25.

[286]    See Tr. 26.

[287]    See Tr. 25, 27.

able to perform jobs he held in the past.[288]   Plaintiff did have
some managerial skills that he could transfer to his new job.[289]
Based on the testimony of the VE, the ALJ found that there was a
"significant number" of jobs in the national economy that Plaintiff
could pursue.[290]   Therefore, the ALJ found that Plaintiff was not
disabled.[291]

Plaintiff appealed the ALJ's decision, and, on June 30, 2014,
the Appeals Council denied Plaintiff's request for review, thereby
transforming the ALJ's decision into the final decision of the
Commissioner.[292]   After receiving the Appeal Council's denial,
Plaintiff timely sought judicial review of the decision by this
court.[293]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying supplemental security income and disability benefits is
limited to the determination of whether: 1) the ALJ applied proper
legal standards in evaluating the record; and 2) substantial

---

[288]   See id.

[289]   See id.

[290]   See Tr. 28.

[291]   See id.

[292]   See Tr. 1.

[293]   See Tr. 5.

evidence in the record supports the decision.  Waters v. Barnhart,
276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the
ultimate burden of proving he is disabled within the meaning of the
Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under
the applicable legal standard, a claimant is disabled if he is
unable "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment. . . which
has lasted or can be expected to last for a continuous period of
not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also
Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The
existence of such a disabling impairment must be demonstrated by
"medically acceptable clinical and laboratory diagnostic" findings.
42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702
F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any
"substantial gainful activity," the regulations provide that
disability claims should be evaluated according to the following
sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that he has

45

done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999).  If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

**B.   Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance."  Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains two errors under the broader category of failure to consider all of the evidence.  Plaintiff contends that, although the ALJ discussed selected portions of Dr. Sanders' evaluation, the ALJ failed to mention, much less discuss, significant deficiencies and limitations that Dr. Sanders addressed.  Plaintiff also argues that the ALJ failed to consider additional evidence that Plaintiff provided after the hearing but before the ALJ's decision.

Defendant argues that the ALJ need not address every piece of evidence in the record.  Defendant also argues that Plaintiff failed to show how Dr. Sanders' opinion warranted additional work-related mental limitations in the ALJ's RFC finding.  Lastly,

47

Defendant argues the ALJ did not err in her evaluation of the evidence in the record because "[t]he mere presence of some impairment is not disabling per se.  Plaintiff must show that [he] was so functionally impaired by [his impairment] that [he] was precluded from engaging in any substantial gainful activity."[294]

## A.   **Dr. Sander's Results**

The regulations require that every medical opinion received be evaluated.  See 20 C.F.R. §§ 404.1527(b), 416.927(b).  Medical source opinions must be carefully considered, even on issues reserved to the Commissioner.  Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2.

However, a failure to mention every notation in the medical record does not equate with a failure to consider the evidence. The ALJ need not "evaluate in writing every piece of testimony and evidence submitted."  Zalewski v. Heckler, 760 F.2d 160, 166 (7th Cir. 1985); see also Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Vandestreek v. Colvin, No. 7:14-CV-00001 O, 2015 WL 1239739, at *6-7 (N.D. Tex. Mar 17, 2015)(unpublished)(collecting cases); McDaniel v. Astrue, Civil Action No. 3:11-CV-1221-D, 2011 WL 6337790, at *5 (N.D. Tex. Dec. 19, 2011)(unpublished).  "The ALJ may not have discussed all of the evidence in the record to the extent desired by Plaintiff, but the ALJ is only required to make

---

[294]   See Doc. 13, Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. p. 3. (citing Hames v. Heckler, 707, F.2d 162, 165 (5th Cir. 1983)).

clear the basis of [her] assessment—[s]he need not discuss all supporting evidence or evidence rejected." Black v. Colvin, No. 2:12-CV-0233, 2014 WL 1116682, at *5 (N.D. Tex. Mar. 20, 2014).

Plaintiff's challenge fails.  To begin with, the court finds plain evidence in the ALJ's decision that she did, in fact, consider Dr. Sanders' evaluation results.  The ALJ affirmatively stated that she considered all of the record evidence and dedicated approximately one-half of a page of her ten-page decision to Dr. Sanders' eight-page report.

The ALJ discussed Plaintiff's familial history, Plaintiff's demeanor during the interview and testing and his comprehension of the test instructions, and the results of his academic, intellectual, and personality testing particularly as all results related to Plaintiff's claimed impairment of depression.

The only indication that Plaintiff asserts to demonstrate that the ALJ failed to consider all of Dr. Sanders' report is that the ALJ did not specifically mention Dr. Sanders' test results which indicated that Plaintiff's processing speed scored in the severely deficient range or Dr. Sanders' opinion that a complete neuropsychological evaluation might assist in identifying Plaintiff's vocational strengths and weaknesses related to any cognitive impairment.

As it relates to the ALJ's finding that Plaintiff was not disabled, Plaintiff's complaint is that, by failing to mention

Plaintiff's severe deficiency in processing speed, the ALJ failed to take into consideration that Plaintiff may require extra time to complete tasks or assignments.  In fact, that deficiency was subsumed in the ALJ's RFC, which limited Plaintiff to unskilled work despite Plaintiff's past employment in skilled and semiskilled jobs and the VE's testimony that his managerial skills were transferable.

When determining transferability of skills, the ALJ must consider all exertional and nonexertional limitations.  SSR 82-41, 1982 WL 31389, at *5.  "[M]ental limitations may prevent a claimant from performing semiskilled or skilled work activities essential to a job."  Id.  Unlike skilled and semiskilled jobs, "[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. §§ 404.1568(a), 416.968(a).

By limiting Plaintiff to unskilled work, the ALJ accommodated the only functional limitation (extra time to complete tasks) that was suggested in Dr. Sanders' report related to processing speed and cognitive impairments.  See Ross v. Colvin, No.4:12 CV 283 Y, 2013 WL 5423980, at *8 (collecting cases)("[E]ven assuming that [the plaintiff] faced moderate to marked limitation in attention, concentration, persistence, and pace that should have been

50

reflected in the RFC, this limitation would not preclude her from performing the 'simple' requirements of her previous work as a housekeeping cleaner.").

The ALJ is tasked with considering and weighing the relevant evidence, not with recording in writing every aspect of her process. Here, the ALJ clearly considered Dr. Sanders' report, discussed it in some detail, and incorporated all limitations therein in her RFC assessment.

**B.    Post-hearing, pre-decision evidence**

Plaintiff's argument here focuses solely on the ALJ's failure to discuss additional evidence Plaintiff submitted after the hearing. That argument is not compelling for the same reason discussed above, to wit, that it is unnecessary for the ALJ to discuss in writing every piece of evidence in the record. The court also finds that Plaintiff fails to translate diagnoses and impressions into functional limitations and that the majority of the evidence Plaintiff cites is cumulative.

Plaintiff points out five sections of the additional evidence that he suggests "document[] the chronicity and debilitating nature of [Plaintiff's] severe impairments."[295]   The first contains records of Plaintiff's hospitalization in Pennsylvania in January 2010, and Plaintiff highlights the record showing a discharge diagnosis of HE.

---

[295]    Doc. 11, Pl.'s Mot. for Summ. J. p. 7.

The second is an abdominal MRI from November 2010, and, there, Plaintiff highlights the interpretive impressions of pancreatic atrophy, chronic pancreatitis, and possible changes of early cirrhosis.  The third is an upper EUS of August 2011 that refers, in the report, to dilated pancreatic duct, chronic calcific pancreatitis, and esophageal varices in the lower esophagus.

The fourth section is from an encounter date of September 13, 2011, but is actually a reprinted report from an MRI performed on November 15, 2010, which was already in the record.[296]  With regard to the impressions from the MRI, Plaintiff highlights diagnoses of cirrhosis, portal hypertension, portosystemic encephalopathy, and viral hepatitis.  The last section is a portion of a treatment note by Dr. Mendoza reviewing Plaintiff's systems.  Plaintiff highlights that Dr. Mendoza acknowledged that Plaintiff experienced numbness or tingling of extremities.

It is not for the ALJ or the court to research medical journals to determine possible limitations resulting from these identified diagnoses and impressions.  Plaintiff bears the burden of proving disability.  Encephalopathy is mentioned in the 1669-page record only a few times and never with a thorough description of its effects on Plaintiff.  One of the two references in the additional evidence equates portosystemic encephalopathy with

---

[296]    Compare Tr. 942-43 with Tr. 1064-65.

insomnia.  The ALJ took into consideration Plaintiff's report that he slept only six hours a night.[297]

Cirrhosis of the liver is mentioned many times in the record, but, each time, the record provides no functional effects of the diagnosis.  Similarly, the assessment that lists "Viral Hepatitis" provides no other information, much less a description of the disease's effect on Plaintiff's ability to work.  The notation by Dr. Mendoza of numbness or tingling of extremities was reported by Plaintiff to the ALJ at the hearing, and the ALJ specifically acknowledged this hearing testimony in her decision.  But nothing in the medical record or Plaintiff's testimony indicates that the tingling sensation would prevent Plaintiff from performing the medium, unskilled jobs cited by the ALJ.  Furthermore, none of these ailments discussed above were identified by Plaintiff as conditions underlying his inability to work.

Finally, the diagnoses related to pancreatitis and cirrhosis were cumulative of information elsewhere in the record.  The ALJ clearly took into account pancreatitis and hypertension, finding the former to be a severe impairment and dismissing the latter because it was well controlled by medication.

Nothing in the additional evidence would have changed the decision of the ALJ.  It is not within the discretion of the court to second guess and substitute its judgment for that of the

---

[297]    _See, e.g.,_

Commissioner. <u>Bowling</u>, 36 F.3d at 434.   The ALJ retains the sole responsibility for determining a claimant's RFC.   <u>Ripley v. Charter</u>, 67 F.3d 552, 557 (5th Cir. 1995).   The task of weighing the evidence is the province of the ALJ.   <u>Chambliss v. Massanari</u>, 269 F.3d 520, 523 (5th Cir. 2001).

As is abundantly evident from the lengthy factual history included in this memorandum, the court has reviewed the entire record very closely.   The court recognizes the seriousness of Plaintiff's condition and the resulting difficulties.   However, the court's authority to review the record extends only to a determination of whether the ALJ's decision is supported by more than a scintilla of evidence.   <u>See</u> <u>Carey</u>, 230 F.3d at 135.   The court finds more than a scintilla of evidence in support of the ALJ's decision and therefore must affirm the finding of the ALJ.

The ALJ's decision is supported by substantial evidence and is founded in sound legal standards.   Accordingly, the court should deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's motion for summary judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days

from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 30th  day of July, 2015.


_____
  U.S. MAGISTRATE JUDGE